**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| EMOJI COMPANY GmbH, ) | Case No. 22-CV-2378 |
| ) | |
| Plaintiff, ) | |
| vs. ) | |
| ) | |
| THE INDIVIDUALS, CORPORATIONS, ) | Judge John J. Tharp, Jr. |
| LIMITED LIABILITY COMPANIES, ) | |
| PARTNERSHIPS AND ) | |
| UNINCORPORATED ASSOCIATIONS ) | |
| IDENTIFIED ON SCHEDULE A HERETO, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT WINLYN'S MOTION TO DISSOLVE THE**
**PRELIMINARY INJUNCTION AND/OR LIFT THE ASSET FREEZE**

Defendant Shantou City Zhuoxiang Trading Co., Ltd. (listed as Defendant 232 in Schedule A to the Complaint ("Winlyn")), submits this Memorandum of Law in Support of its Motion to Dissolve the Preliminary Injunction and/or Lift the Asset Freeze.

**TABLE OF CONTENTS**

I.      INTRODUCTION ……………………………………………………………… 1

II.     STATEMENT OF RELEVANT FACTS…………………………………………….. 3

III.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION
        AGAINST WINLYN BECAUSE IT HAS FAILED TO SHOW THE
        THREE REQUIRED THRESHOLD FACTORS……………………………………… 5

        A.      Plaintiff's claim is not likely to succeed because Winlyn's
                use of "Emoji" was statutory fair use of a generic word,
                and there is no evidence of consumer confusion…………………………………6

        B.      Plaintiff has not made the required "clear showing"
                of likely irreparable harm absent an injunction against Winlyn……………………….. 13

        C.      If the court does move on to the balancing phase, the balance
                of harms also supports dissolving the injunction against Winlyn………………………15

IV.     CONCLUSION ……………………………………………………………...17

i

## **TABLE OF AUTHORITIES**

**Cases**

*Alzheimer's Disease & Related Disorders Ass'n, Inc., v.*
  *Alzheimer's Foundation of Am., Inc.,* 307 F. Supp. 3d 260 (S.D.N.Y. 2018)..................... 17

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009)................................................................. 9

*Burton v. Wetzel*, 2021 WL 1374681 (M.D. Pa. Apr. 12, 2021).......................................... 13

*Caster Connection, Inc. v. Colson Group Holdings, LLC*, 2020 WL 2745982 (N.D. Ill. 2020)........ 5, 6

*Charter Nat'l Bank & Trust v. Charter One Fin., Inc.*, 2001 WL 527404 (N.D. Ill. 2001).............. 16

*Cywan v. Blair*, 16 F.2d 279 (N.D. Ill. 1926)............................................................. 13

*Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655 (7th Cir. 1965)........................... 7

*G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985 (7th Cir. 1989)....................... 10

*Health King Enter., Inc. v. Dalian Health King Prods. Co.*, 2020 WL 1201533 (N.D. Ill. 2020)...... 5, 6

*Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F.Supp.2d 789 (N.D. Ill. 2007)..................... 6, 7, 9

*Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053 (7th Cir. 2016)...................................... 16

*Keegan v. Apple Computer, Inc.*, 1996 WL 667808 (N.D. Ill. 1996)..................................... 7, 8

*Kellytoy Worldwide, Inc. v. Ty, Inc.*, 2020 WL 5026255 (N.D. Ill. 2020)................................ 17

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).............................................................. 5

*Mega Mfg., Inc. v. Haco Atlantic, Inc.*, 2000 WL 705989 (N.D. Ill. 2000).............................. 17

*Mil-Shar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153 (7th Cir. 1996)....................................... 7, 9

*Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (N.D. Ill. 2020).......................... 5

*Packman v. Chicago Tribune Co.*, 267 F.3d 628 (7th Cir.2001).......................................... 7

*Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2020 WL 6265133 (N.D. Ill. 2020)............. 15

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
  80 F. Supp. 2d 815 (N.D. Ill. 1999)............................................................... 12

*Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380 (7th Cir. 1984)............................ 16

*SFG, Inc. v. Musk, et al.*, 2019 WL 5085716 (N.D. Ill. 2019)......................................... 5, 6, 15

*Sorensen v. WD-40 Co.*, 792 F.3d 712 (7th Cir. 2015)............................................... 11

*Summers v. Smart*, 65 Supp. 3d 556 (N.D. Ill. 2014)................................................. 15

*Tee Turtle LLC v. Kellytoy Worldwide, Inc.*, 2021 WL 1254665 (N.D. Cal. 2021)................... 14, 15

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, (1992).................................................... 6, 7

*Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314 (N.D. Ill. 1991).............................. 16

*Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891 (7th Cir. 2001)..................................................... 6

*UIRC-GSA Holdings, Inc. v. William Blair & Company, L.L.C.*,
    2017 WL 1163864 (N.D. Ill. March 28, 2017)................................................... 9

*Valencia v. City of Springfield, Illinois*, 883 F.3d 959 (7th Cir. 2018)...................................... 5

*Vienna Beef Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870 (N.D. Ill. 2011)...................... 16

## **Statutes**

15 U.S.C. § 1115(b)(4) (2022)................................................................................. 10

15 U.S.C. § 1116(a) (2022)................................................................................... 13

## **References**

"Emoji", *Dictionary.com*, (Dictionary.com LLC 2022)
    https://www.dictionary.com/browse/emoji ......................................................... 8

"Emoji", *Merriam Webster Online Dictionary* (Merriam Webster 2022)
    https://www.merriam-webster.com/dictionary/emoji ...................................... 8

"Emoji", https://en.wikipedia.org/w/index.php?title=Emoji&oldid=1092342012
    (last visited June 13, 2022)................................................................................. 8

JOHANNA MAYER, "THE ORIGIN OF THE WORD 'EMOJI'", SCIENCE FRIDAY
    (March 13, 2019), https://www.sciencefriday.com/articles/the-origin-of-the-word-emoji/
    (last visited June 12, 2022)................................................................................. 1

## I.     INTRODUCTION

The Court should dissolve the injunction entered against Defendant Winlyn[1] because the <u>facts</u> of this case — as opposed to Plaintiff's unsupported generalizations – don't justify that extraordinary relief.

*First*, and most importantly, Plaintiff's infringement claim against Winlyn is weak. Plaintiff cannot make the required clear showing of a reasonable likelihood of success on the merits because: (1) "Emoji" is a generic phrase not protectible under the Lanham Act (especially as applied to sales of literal "emojis");(2) Winlyn has a strong statutory fair use defense; and (3) Plaintiff has not sufficiently shown any likelihood of confusion between the parties' products.

Winlyn used the word "emoji" not as branding, but as one small part of its description of a <u>WINLYN-branded</u> product — stickers showing emojis. There was no counterfeiting or false designation of origin, and there could be no consumer confusion because the stickers were clearly identified and sold as Winlyn products. It seems doubtful that ordinary consumers even know Plaintiff or its Emoji® brand exist, and Plaintiff presents no evidence beyond bare assertions to prove otherwise.

Plaintiff has secured trademarks purportedly covering many uses of the word "emoji" in commerce but cannot legally bar companies from describing emojis. "Emoji" is an amalgam of the Japanese words for "picture" and "letter," and serves as a generic term for a pictogram which long predates Plaintiff's marks.[2] The term is generic when applied to emojis and was purely descriptive as applied to the accused product. Plaintiff has no legal right to bar Winlyn from truthfully, literally describing a type of product it sells.

*Second*, Plaintiff has not made the required clear showing of likely irreparable harm absent an injunction, particularly given the weakness of its infringement claim. Perhaps trying to distract the reader from this failure, Plaintiff's papers fall back on sweeping general accusations about "illegal [counterfeiting]

---

[1] Defendant's name in Chinese is "Shantou Zhuoxiang Maoyi Youxian Gongsi."

[2] *See, e.g.,* JOHANNA MAYER, *The Origin of the Word 'Emoji'*, SCIENCE FRIDAY (March 13, 2019), https://www.sciencefriday.com/articles/the-origin-of-the-word-emoji/ (last visited June 12, 2022). *See also* https://emojipedia.org/.

operations" and "tens of thousands of lost jobs for legitimate businesses and broader economic damages" (*See, e.g.,* Complaint ("Compl.") at ¶¶ 4, 14.) But Plaintiff's overheated rhetoric doesn't fit the facts.

Plaintiff has presented no evidence showing it has suffered or would suffer any actual harm, much less irreparable harm, from Winlyn's use of "emoji" to describe Valentine's Day-themed stickers (depicting emojis) which were one product among hundreds sold in its Amazon store. As far as Winlyn knows, the parties do not compete directly, and its limited sales of the accused product has cost Plaintiff nothing. Plaintiff asserts harm from an alleged "loss of exclusivity" and other intangible factors, but its arguments are weakened because the Emoji Company is a non-practicing entity which exists solely to license its intellectual property. *See* https://www.emoji.com (Plaintiff describes itself as a licensing company with "more than 1,000 notable licensees.") As to the question of whether traditional legal remedies are available to Plaintiff, Winlyn has appeared in this case and there is no reason to think it could not satisfy any likely judgment.

Finally, if the court even reaches the balancing phase of the analysis, the balance of harms strongly favors Winlyn, especially as to the asset freeze. There is no good reason to keep Winlyn's Amazon.com operating account frozen. Winlyn is an established e-commerce retailer with its own successful brand and intellectual property, not a fly-by-night counterfeiter. (*See* Exhibit ("Ex.") 1 - Declaration of Lin in Support of Defendant Winlyn's Motion to Dissolve the Preliminary Injunction And/Or Lift the Asset Freeze, dated 06/13/22 ("Lin Decl."), ¶¶ 1, 4-6.) The current freeze captures all of Winlyn's Amazon sales revenue, has severed Winlyn's Amazon store from its normal source of operating capital, and seriously disrupts Winlyn's business operations and cashflow. (*Id.*, ¶¶ 9-11, 18.) The frozen assets (which grow each day) now vastly exceed the total sales of the accused product. (*Id.*, ¶¶ 15-16). Plaintiff cannot credibly argue it needs more than $500,000 frozen as security for damages in this case.

This case follows an increasingly common pattern: a plaintiff sues a mass of defendants (under seal) for alleged infringement or "counterfeiting" using a generic Complaint and then moves *ex parte* to bar sales and

freeze assets. Plaintiff's Complaint and motions are long on rhetoric and generalizations but short on specifics against the individual defendants. And this plaintiff, Emoji Company GmbH, has made a veritable business out of mass trademark lawsuits, filing roughly seventy cases alleging trademark infringement against (estimated) thousands of defendants since 2020. (*See* Ex. 2 – Declaration of Peter J. Curtin ("Curtin Decl.") at Exs. A & B.) But when a Plaintiff does not carefully investigate, this "[sue] them all and let [the courts] sort them out" strategy unjustly harms ordinary retailers baselessly labeled as counterfeiters. The Court should dissolve the preliminary injunction entered against Winlyn.

## II.    STATEMENT OF RELEVANT FACTS

1.      Shantou City Zhuoxiang Trading Co., Ltd. ("The Company" or "Winlyn") was founded in March, 2017 and is located in Shantou City, Guangdong, China. The Company has 95 employees and makes and sells products including home decoration supplies, party supplies, toys, and crafts. (Lin Decl., ¶¶1, 4.)

2.      The Company owns the US trademark WINLYN (Reg. Nos. 5,726,831; 6,527,699; and 6,576,744), which it first used in commerce in April 2017, and first registered on the Principal Register of the U.S. Patent and Trademark Office in April 2019. (*Id.*, ¶ 5 & Ex. 1.)

3.      The Company opened a store on Amazon.com in April 2017 named the Winlyn Store (Store ID ARM5JG1QBG2C7) ("the Store"). (*Id.*, ¶ 6.) Through the Store, Winlyn sells to consumers in the United States. In more than five years, the Store had never been accused of infringing anyone's intellectual property until Plaintiff lodged its complaint with Amazon around May 13, 2022. (*Id.*, ¶ 12.)

4.      The Store sells hundreds of products under the WINLYN brand, including (for example) products in the following categories: greenery, succulents, potted plants, potted succulents, patriotic-themed products, envelopes, flowers, fabric & ribbon, artificial garlands, artificial fruits, greeting cards, toys & games, artificial flowers, arts & crafts, planters & vases, automotive parts, seasonal decorations, party decorations, floral accessories, and office products. The exact number of products available through the Store varies

3

depending on the season (about half of the products are seasonal) but the Store sells more than 1400 different products over the course of a year. In early June, the Store was selling 629 different products. (*Id.*, ¶ 6.)

5.      One product sold through the Store was a pack of adhesive foam stickers having tiny smiley faces, or emoji designs, which was listed on its Amazon product page as the "Winlyn 321 Pcs Assorted Valentine's Day Stickers Embellishments Craft Smile Face Heart Shaped Cutouts Foam Stickers Emoji Round Foam Stickers Self-Adhesive for Kids Scrapbooking Cards Decoration" (the "Winlyn Stickers"). (*Id.*, ¶ 7; *see* Curtin Decl. at Ex. C.) The WINLYN mark is the first word in the product description, identifying the stickers as Winlyn products.

6.      According to the Store's records, the Store sold 1,019 units of the Winlyn Stickers into the United States through May 13, 2022, producing total gross revenue of $13,804. (Lin Decl., ¶ 16.)

7.      On May 13, 2022, Amazon notified the Store by email (at its official Amazon email) that it had de-listed (removed) the Winlyn Stickers from the Amazon Marketplace based on an infringement complaint. Amazon also notified the Store that it had frozen its operating account per a court order. (*Id.*, ¶¶ 9-10.)

8.      Winlyn's Amazon operating account is essentially the Store's business bank account. It receives the revenue from all of the Store's sales, and Winlyn uses that money to pay the Store's operating expenses, such as payments to Amazon for storage and shipping. (*Id.*, ¶ 11.) Winlyn routinely withdrew cash from the account (above the minimum balance Amazon requires) to manage its cashflow for daily operations. (*Id.*)

9.      Because the Store continues to operate, the frozen Amazon operating account now contains more than $516,000 and continues to grow. (*Id.*, ¶ 15.) All revenue earned since May 13, 2022 remains frozen and unavailable to the Store. The continuing restraint on the Store's operating account has caused and is causing significant business difficulties for the Store and the Company. (*Id.*, ¶¶ 15, 18.)

10.     Winlyn has no offices or employees in the United States and is not very familiar with the U.S. legal system. It had never been involved in U.S. litigation before this case. (*Id.*, ¶ 12.) As a result, Winlyn did

not have U.S attorneys and it took some time to locate, hire and consult with a suitable U.S. law firm. (*Id.*)

11.    Winlyn hired its U.S. attorneys just as the Plaintiff filed its *ex parte* Motion for Preliminary Injunction on June 2, 2022. (Dkt. 14.) Plaintiff also served the Complaint and Summons on Winlyn by email on June 2, 2022. (Dkt. 44.) The Court granted Plaintiff's *ex parte* Motion on June 6, 2022. (Dkt. 47.)

## III.    PLAINTIFF IS NOT ENTITLED TO A PRELIMINARY INJUNCTION AGAINST WINLYN BECAUSE IT HAS FAILED TO SHOW THE THREE REQUIRED THRESHOLD FACTORS.

In the Seventh Circuit a preliminary injunction is extraordinary relief — the exception rather than the rule. "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case *clearly* demanding it. It is never awarded as a matter of right." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1072 (N.D. Ill. 2020) (quoting *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 965–66 (7th Cir. 2018) (internal quotations omitted) (emphasis added)); *see also Health King Enter., Inc. v. Dalian Health King Prods. Co.*, 2020 WL 1201533, at *3 (N.D. Ill. 2020) (recognizing the "extraordinary and drastic" nature of a preliminary injunctive relief). To satisfy its burden of persuasion, Plaintiff must make "a clear showing" justifying a preliminary injunction. *See Caster Connection, Inc. v. Colson Group Holdings, LLC*, 2020 WL 2745982, at * 3 (N.D. Ill. 2020) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). But the Plaintiff has not made the required clear showing against Winlyn.

In this district, courts analyze the merits of a proposed preliminary injunction in two phases — a "threshold phase" and a "balancing phase." *See SFG, Inc. v. Musk, et al.*, No. 19-cv-02198, 2019 WL 5085716, at *2 (N.D. Ill. 2019). In the threshold phase, the court evaluates whether the movant has shown: (1) likely irreparable harm absent a preliminary injunction; (2) that traditional legal remedies would be inadequate; and (3) that its claim has some likelihood of success on the merits. *See id.* (citing *Valencia v. City of Springfield*, 883 F.3d 959, 965–66 (7th Cir. 2018)). If the plaintiff meets all three requirements, the court then "moves to the balancing phase and weighs the irreparable harm that the moving party would endure without the protection

of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Id.* If the movant fails to meet any one of those requirements, the injunction cannot issue. *See id.* at *15 (If a movant cannot meet the threshold requirements, the court need not analyze the balance of harm). The court "must also consider the public interest in denying or granting the injunction." *Id.* at *2 (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001)).

This Court granted Plaintiff preliminary relief on an *ex parte* basis. (*See* Dkt. 14.) But, as shown below, Plaintiff's motion cannot withstand an adversarial presentation which includes considering Winlyn's defenses. *See Health King*, 2020 WL 1201533, at *3 ("[A] district court may consider a nonmovant's defenses in determining the movant's likelihood of success on the merits.") (citation omitted). On the facts of this case, Plaintiff is not likely to succeed on the merits and not entitled to a preliminary injunction.

## A.     Plaintiff's claim is not likely to succeed because Winlyn's use of "Emoji" was statutory fair use of a generic word, and there is no evidence of consumer confusion.

Plaintiff has not clearly shown a likelihood of success on the merits of its trademark claims against Winlyn for at least three reasons: (1) "Emoji" is a generic word that is not entitled to trademark protection; (2) Winlyn has a strong statutory fair use defense and (3) Plaintiff has not sufficiently demonstrated a likelihood of confusion based on Winlyn's sales of the accused product.

First, the most serious weakness in Plaintiff's request for preliminary relief is the generic nature of its "Emoji" mark. *See Hickory Farms, Inc. v. Snackmasters, Inc.*, 500 F.Supp.2d 789, 792 (N.D. Ill. 2007) (generic terms used as trademarks are entitled to no protection). As this Court recognized in *Caster*, a trademark's value, and enforceability stem from its ability to serve as an indicator of source or origin. *See Caster*, 2020 WL 2745982, at *3. Here Plaintiff has made no showing that the use of "emoji" indicates that it (Emoji Company GmbH) is the source of the goods in question, or the term or the iconic emojis themselves.

"The law classifies trademarks into five categories of increasing distinctiveness: generic, descriptive, suggestive, arbitrary, and fanciful." *Hickory Farms,* 500 F. Supp. 2d at 792 (N.D. Ill. 2007) (citing *Two Pesos,*

6

*Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767–68 (1992); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir.2001)). The generic mark is at the bottom of the hierarchy and is entitled to no protection. *Hickory Farms*, 500 F.Supp.2d at 793 (determining that "beef stick" and "turkey stick" are generic terms). A word or phrase is generic if (as with the word emoji) it is "commonly used to name or designate a kind of goods." *See Mil-Shar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1157 (7th Cir. 1996) (reversing the grant of preliminary injunction because the phrase "Warehouse Shoes" was generic). While a valid trademark identifies the source of a product, a generic term describes only "the type, or genus, of thing into which common linguistic usage consigns that product." *Id.* (citation omitted). *See Keegan v. Apple Computer, Inc.*, 1996 WL 667808, at *5 (N.D. Ill. 1996) ("A generic term cannot become a valid trademark because 'the first user cannot deprive manufacturers of the product of the right *to call an article by its name*.'") (emphasis added).

Simple common sense and the purposes of trademark law undergird the premise that generic terms cannot become (or continue to be) enforceable trademarks. As the Seventh Circuit explained decades ago when evaluating the registered trademark "yo-yo," "[a] court is not obligated to close its eyes and refuse to see or its mind and refuse to recognize that which is obvious to the public in general." *Donald F. Duncan, Inc. v. Royal Tops Mfg. Co.*, 343 F.2d 655, 668 (7th Cir. 1965). Recognizing the obvious, the Seventh Circuit reversed the trial court's ruling for the trademark holder and held that whether or not "yo-yo" had been properly registered as a trademark in 1930, by the 1960s it had become "by reason of the general acceptance by the public" a generic term used to describe the toy. *Id.* at 659. *See also* Lin Decl., ¶ 8 ("I do not know how to describe a sticker showing an emoji without using the word 'emoji'.").

Here, as in the *Duncan* case, several common-sense factors indicate the word "emoji" is now a generic term even if it may not have always been so. For example, "[s]ignificant use of a term by competitors in the industry has traditionally been recognized, along with dictionary evidence, as indicating genericness." *Mil-Shar*, 75 F.3d at 1159. The sheer number of trademark infringement cases filed by Plaintiff and the number of

7

defendants it has sued in just the past two years[3] strongly indicates that "emoji" is a generic term used for particular types of icon designs, including tiny smiley faces. And simple internet searches further reinforce the "genericness" of the word "emoji." *See Keegan*, 1996 WL 667808, at *6 ("A common source of evidence on genericness is the dictionary."). The Merriam Webster website defines "emoji" as "any of various small images, symbols, or icons used in text fields in electronic communication (as in text messages, email, and social media) to express the emotional attitude of the writer, convey information succinctly, communicate a message playfully without using words, etc." *See* https://www.merriam-webster.com/dictionary/emoji (last visited June 13, 2022). Dictionary.com defines it as "a small digital picture or pictorial symbol that represents a thing, feeling, concept, etc., used in text messages and other electronic communications and usually part of a standardized set." *See* http://www.dictionary.com/browse/emoji (last visited June 13, 2022). Wikipedia.com describes an emoji as "a pictogram, logogram, ideogram, or smiley embedded in text and used in electronic messages and web pages." *See* https://en.wikipedia.org/wiki/Emoji (last visited June 13, 2022). That reference website also explains that the word originated in Japan in 1997 but became popular worldwide in the 2010s. *Id*.

Finally, reviewing relevant technical resources confirms that "emoji" is a standard term for representations of certain arrangements of digital characters. The website https://emojipedia.org was launched in 2013 and describes itself as "an emoji reference website which documents the meaning and common usage of emoji characters in the Unicode Standard." https://emojipedia.org (last visited June 13, 2022). The Unicode Standard is published by the non-profit Unicode Consortium, which specifies the international standards for representing text in modern software products and standards. *See* https://unicode.org/consortium/consort.html (last visited June 13, 2022). The Unicode Consortium has a subcommittee on emojis, currently led by employees of Google and Apple, and the website includes links to long lists of officially-recognized emojis.

---

[3] This Plaintiff has filed about 70 trademark infringement cases against alleged users of the word "emoji" since 2020. Many cases had sealed lists of defendants, as does this case, so the exact number of defendants remains unknown but likely totals in the thousands. (*See* Curtin Decl., ¶¶ 4-5 & Exs. A-B.)

*See* https://unicode.org/emoji/techindex.html (last visited June 13, 2022).

This information raises the critical question this Court must consider — whether or not the mark was properly registered in 2014, does "emoji" deserve continued trademark protection? *See Hickory Farms,* 500 F. Supp. 2d at 794 ("Terms become generic not because manufacturers lack creativeness in naming their products, but because no other words have emerged as synonyms for certain types of goods . . . ."); *see also Mil-Shar*, 75 F.3d at 1162 ("Allowing a generic term to have trademark protection would overstep the purposes of trademark law and violate fundamental concepts of fair competition. . . . [A company] cannot appropriate the English language, and by doing so render a competitor inarticulate."). Winlyn submits that in 2022 the word "emoji" does not qualify for trademark protection. The truth seems to be that Plaintiff saw an opportunity for licensing revenue, and so filed and registered its "Emoji" trademark for "Stickers" on August 26, 2014, (Reg. No. 4,868,832), claiming a priority date of August 15, 2014. But by August 2014 the word emoji was already generic, as illustrated by the launch of the website "emojipedia.org" in 2013.

Plaintiff simply avoids this issue, instead relying on conclusory boilerplate and the (rebuttable) presumption of validity U.S. law grants registered trademarks. (*See, e.g.,* Complaint ¶ 9 ("Plaintiff has expended significant resources annually in advertising, promoting, and marketing featuring Plaintiff's Trademarks. . . Because of these and other factors, Plaintiff's name and Plaintiff's Trademarks have become famous worldwide.").) But conclusory statements merely reciting claim elements and legal standards without supporting facts are not "well-pleaded factual allegations" this Court must credit. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *UIRC-GSA Holdings, Inc. v. William Blair & Company, L.L.C.*, No. 15-cv-9518, 2017 WL 1163864, at *6 (N.D. Ill. March 28, 2017) ("In sum, Plaintiff's boilerplate allegations of contributory and vicarious liability lack the factual detail required to show that Kalt is personally liable for the alleged infringement.")(citing *Iqbal*, 556 U.S. at 578). Therefore, Plaintiff's self-serving conclusions cannot salvage

the word "emoji" and turn it into a protectible trademark. Plaintiff has provided no evidence to show that whatever unspecified "resources" or "other factors" it has expended has transformed the word "emoji" into an indicator of <u>Plaintiff</u> (Emoji Company GmbH) as the source or origin of products. Again, common sense indicates that consumers likely know what an "emoji" is but are unlikely to have heard of the Plaintiff.

*Second*, Plaintiff's infringement claim is unlikely to succeed due to Winlyn's strong fair use defense. Even if the Court does not rule that "emoji" is generic, the term is at most descriptive as applied to Winlyn's accused emoji stickers and thus not protectible when used in that context. *See, e.g.*, *G. Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 873 F.2d 985, 1001 (7th Cir. 1989) (affirming decision that the trademark "LA" (for low alcohol beer) was "merely descriptive" and not protectible). In this case the record shows Winlyn used the word "emoji" as to the Winlyn Stickers in good faith to describe and discuss the product. (*See* Lin Decl., ¶ 8; Curtin Decl. at Ex. C (Winlyn Stickers Amazon Product Page)). This is the quintessential example of "fair use" permitted and protected by the trademark statute. The fair use doctrine provides a defense to a trademark infringement claim when "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin.'" 15 U.S.C. § 1115(b)(4). Mr. Lin has testified that Winlyn's use of "emoji" was simply a reference to the commonly-used word which described the accused stickers with tiny smiley faces. (Lin Decl., ¶ 8). Winlyn's prominent use of its own brand and trademark ("Winlyn") in the product name also shows its good faith. The word "emoji" was only one minor part of the product description. Plaintiff is not entitled to bar all uses of the word "emoji."

*Third*, even aside from whether "emoji" is generic or descriptive in this case, Plaintiff has failed to make a clear showing that will likely succeed on the merits because it hasn't made a clear showing of likely confusion. The Seventh Circuit applies a seven-factor test when assessing likelihood of confusion. No one factor in that test is "dispositive," but "three are especially important: the similarity of the marks, the intent of

the defendant, and evidence of actual confusion." *Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015) (citing *Ty, Inc.*, 237 F.3d at 898). In this case, while the word "emoji" is identical to the Plaintiff's alleged mark "Emoji," there is substantial evidence of Winlyn's innocent intent and no evidence of actual confusion.

Plaintiff's discussion of the Seventh Circuit's test for likelihood of confusion is cursory at best and cannot support an injunction against Winlyn. (*See* Dkt. 11, at pp. 14-16.) In fairness, Plaintiff' discussion of likelihood of confusion could be no better than cursory because Plaintiff lumped Winlyn with more than two hundred other defendants. But despite Plaintiff's generalizations, these defendants are not a monolith and should not be treated as one for the purposes of this preliminary injunction.

Winlyn freely admits that, like millions of other companies and individual Sellers, it operates "fully interactive marketplace listings on . . . Amazon." (*See* Compl. at ¶ 14; Lin Decl., ¶ 6.) But how many of the other Defendants operate Amazon stores selling hundreds of products, all but one unrelated to this case? (*See* Lin Decl., ¶ 6.) We don't know. Some, perhaps even all (!), of the hundreds of other defendants may work together and conspire to harm Plaintiff as alleged. But Winlyn has no business relationship with any other defendant and had no idea the Emoji Company even existed before this lawsuit. (*Id.*, ¶ 14.) How many of the other Defendants sold their accused products using their own successful brand and registered US trademark? (*Id.*, ¶¶ 5, 7.) We don't know, but those facts surely diminish the chance that any consumer would confuse the Winlyn products with Plaintiff's unspecified products. Are any of the other Defendants selling products identical to Winlyn's products? We don't know, but Winlyn assumes the accused products are sold under different brand names, package sizes, prices, and descriptions. Put simply, Plaintiff's cursory, generalized discussion has nothing to do with Winlyn's accused product and doesn't justify an injunction against Winlyn.

Plaintiff has failed to show two of the three factors that the Seventh Circuit has identified as having particular significance in the likelihood of confusion analysis — intent and actual confusion. There is no evidence, and no reason to believe, that Winlyn marketed and sold the Winlyn Stickers with any intent to

11

deceive, and similarly no evidence, and no reason to believe, that Winlyn's product has caused any actual confusion. Plaintiff tries to claim that the court can just "infer" actual confusion. (*See* Dkt. 11, pp. 16.) But the Court should not credit Plaintiff's argument because it has identified no support for such an inference <u>against Winlyn</u>. In any event, Plaintiff's failure to identify a single instance of actual confusion involving Winlyn's products must be counted against Plaintiff's proposition that actual confusion is likely — particularly when considering preliminary injunctive relief.

Finally, when considering the likelihood of confusion, it is also relevant to consider any differences between Winlyn's use of the term "emoji" while describing its WINLYN-branded product (and the overall manner in which it markets its Winlyn Stickers) with Plaintiff's marketing of its own products. *See Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80 F. Supp. 2d 815, 880 (N.D. Ill. 1999) ("[C]ourts must consider the trademark as a whole in light of what occurs in the real world. . . ."). Once again, Plaintiff failed to step up to the plate with any actual evidence or analysis. Plaintiff made no direct comparison between Winlyn's marketing and any examples, descriptions, images, or evidence of actual Emoji® products. To the limited extent any actual Emoji® products or marketing appear in Plaintiff's papers, one screenshot shows a line of brightly colored children's clothing on <u>www.emoji.com</u> which bears no resemblance to the accused Winlyn product or its Amazon product page. (*See* Dkt. 11-1 (Santiago Decl.), at p. 2.) This lack of real-world context and comparison is another reason Plaintiff has failed to make a clear showing of likely confusion and fails to meet its burden of persuasion to justify a preliminary injunction.

Reviewing the evidence and considering Winlyn's fair use defense shows that the Plaintiff hasn't made the clear showing of likely success on the merits required for a preliminary injunction against Winlyn. But there should be no question that these issues have —at a minimum— created significant doubts about whether Plaintiff can succeed on its infringement claims against Winlyn in an adversarial setting. As this Court recognized long ago, "[w]here substantial doubt exists as to the wisdom of the issuance of an injunction, that

fact alone suffices to withhold it." *Cywan v. Blair*, 16 F.2d 279, 281 (N.D. Ill. 1926).[4]  There is far too much doubt regarding Plaintiff's likelihood of success to justify maintaining the existing injunction.

### B.     Plaintiff has not made the required "clear showing" of likely irreparable harm absent an injunction against Winlyn.

Plaintiff's motions have not mentioned the recent amendments to the Lanham Act regarding irreparable harm in trademark infringement cases, and so apparently do not rely on the rebuttable presumption of irreparable harm the Act expressly grants Plaintiffs under certain limited circumstances. Specifically, in the Trademark Modernization Act of 2020, Congress amended the Lanham Act to resolve any questions about the availability of a presumption of irreparable harm in trademark cases following the Supreme Court's decision in *eBay Inc. v. MercExchange*, 547 U.S. 388 (2006) (eliminating the presumption of irreparable harm in patent cases). The relevant statutory language reads:

> The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions . . . . A plaintiff seeking any such injunction *shall be entitled to a rebuttable presumption of irreparable harm* upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction or *upon a finding of likelihood of success on the merits for a violation identified in this subsection in the case of a motion for a preliminary injunction or temporary restraining order*.

15 U.S.C. § 1116(a) (2022) (emphasis added). But the key caveats in the statute show that this presumption does not help the Plaintiff against Winlyn.  First, the law states that the presumption is only available when the Plaintiff has shown a "likelihood of success on the merits." That is not the case here, as discussed above. Second, the presumption is rebuttable, and what evidence exists rebuts any presumption that Plaintiff has been or will be irreparably harmed by Winlyn's accused sales.

Plaintiff cites to several studies, papers, and reports published several years ago about the problem of counterfeiting, the volume of counterfeiting, and the negative economic impacts caused by counterfeiting.

---

[4] This sentiment was echoed much more recently by a court in the Middle District of Pennsylvania which stated succinctly that, "upon an application for a preliminary injunction to doubt is to deny." *Burton v. Wetzel*, 1:19-CV-01574, 2021 WL 1374681, at *1 (M.D. Pa. Apr. 12, 2021) (citation omitted).

That's all well and good, but it has absolutely nothing to do with Winlyn. Plaintiff's broad assertions about "tactics" commonly used by "counterfeiters" (*see* Dkt. 11, pp. 6-8) are irrelevant because there is no evidence Winlyn is counterfeiting. For example, Plaintiff claims that a "common tactic" of counterfeiters is to conceal their identities. (*See id*.) But Winlyn is not concealing its identity and never did. (Lin Decl., ¶¶ 1-5.) Winlyn has deliberately chosen to appear in this case, to contest Plaintiff's claims, and to fight its ransom demand. Winlyn is not a counterfeiter (*see id.*, ¶¶ 12-14), and there is no evidence otherwise.

The only specific allegation Plaintiff has made against Winlyn does not involve selling a copied or counterfeited product. (See Curtin Decl. at Ex. C.) No definition of counterfeiting encompasses a party selling a product through its own webstore under its own brand name and using its own registered trademark while describing the product using a literally true and accurate generic term for that type of product ("emoji") which someone else somehow managed to trademark. "Counterfeiting" must mean more than "we think they infringe." Plaintiff's counterfeiting allegations are baseless and offensive. But of course, without those allegations, Plaintiff would likely have been unable to freeze Winlyn's Amazon operating account.

Plaintiff's lack of evidence also shows the lack of substance to its irreparable harm claim. Plaintiff apparently did not obtain Winlyn's accused product and evaluate its quality vis-à-vis comparable products of its own; it has not presented the results of any such comparison. And while Plaintiff's counsel recites the buzzwords associated with irreparable harm, such as "irreparab[le] damage" and "loss in brand confidence," it is apparent Plaintiff doesn't know whether Winlyn's products are *in fact* causing it any loss of future sales or market share. (*See* Dkt. 11, p. 19.) Plaintiff's witnesses make general statements about "diminished goodwill and brand confidence, damage to Plaintiff's reputation, loss of exclusivity, and loss of future sales," (*see* Dkt. 11-1 - Santiago Decl. at ¶¶ 11-13) and conclude that "the extent of harm to Plaintiff's reputation and goodwill and *the possible* diversion of customers due to loss in brand confidence are both irreparable and incalculable." (*Id.,* (emphasis added)). Plaintiff's uncertain, conclusory testimony weakens its claim to an injunction. *See Tee*

*Turtle LLC v. Kellytoy Worldwide, Inc.*, 2021 WL 1254665, at *16 (N.D. Cal. 2021) ("conclusory statements concerning loss of market share, loss of business opportunity, loss of goodwill, injury to reputation, and price erosion, are insufficient to show irreparable harm" where movant presented no evidence of actual harm).

In sum, Plaintiff has failed to make a clear showing of irreparable harm from Winlyn based on either alleged counterfeiting or the actual facts of Winlyn's sales. This is particularly so because, as discussed above, Plaintiff's likelihood of success on the merits is so low. The weakness of the infringement case also drags down Plaintiff's claims of irreparable harm. *See Summers v. Smart*, 65 Supp. 3d 556, 561 (N.D. Ill. 2014). The *Summers* case notes that the threshold requirements for a preliminary injunction are interdependent, so that a relatively strong showing on one requirement can overcome a relatively weak showing on another. *Id.* By necessary implication, a weak showing on one requirement can weaken a movant's showing on another. *See also Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2020 WL 6265133, at *10 (N.D. Ill. 2020) (noting that where movant's likelihood of success was "not very good," movant must make a "strong showing of irreparable harm").

In sum, Plaintiff has failed to clearly show likelihood of success on the merits against Winlyn or irreparable harm from Winlyn absent an injunction. Plaintiff thus has not passed the threshold requirements to justify a preliminary injunction against Winlyn. On this record, continuing the preliminary injunction (and asset freeze) against Winlyn would be unjust. The court should dissolve the injunction.

C.      **If the court does move on to the balancing phase, the balance
        of harms also supports dissolving the injunction against Winlyn.**

Although the court need not consider this factor (*see SFG, Inc. v. Musk*, 2019 WL 5085716, at *15), if the Court continues to the balancing phase of the analysis, the scales tilt even further towards Winlyn.

*First*, Winlyn is an online retailer whose Amazon store sells a wide variety of products, only one of which is accused of infringement. (Lin Decl., ¶¶ 6-7, 9.) But the broad asset freeze based on Plaintiff's sweeping generalizations keeps Winlyn's Store from accessing any of its sales revenue (and has thus disrupted

15

its normal business operations) for more than three weeks. (*Id.* at ¶¶ 10-11, 15, 17-18.) The amount of money frozen now exceeds $516,000, while alleged infringing sales total less than $15,000. (*Id.*, ¶¶ 15-17.) The harm to Winlyn from the injunction and asset freeze is disproportionate to any corresponding benefit to Plaintiff or any harm Plaintiff could suffer absent an injunction against Winlyn. This alone justifies dissolving the preliminary injunction and asset freeze. *See Turtle Wax, Inc. v. First Brands Corp.*, 781 F. Supp. 1314, 1327 (N.D. Ill. 1991); *see also Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1063 (7th Cir. 2016) (affirming this Court's denial of a preliminary injunction where, *inter alia*, the balance of hardships would have made granting a preliminary injunction inequitable); *Roland Machinery Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 391-92 (7th Cir. 1984) (reversing grant of preliminary injunction where district court made erroneous factual findings regarding the balance of the harms). And a case cited by the Plaintiff also reinforces Winlyn's argument on the balance of harms. In *Charter Nat'l Bank & Trust v. Charter One Fin., Inc*., 2001 WL 527404, at \*1 (N.D. Ill. 2001), this Court reiterated that "[t]he purpose of preliminary injunctive relief is 'to minimize the hardship to the parties pending the ultimate resolution of the lawsuit.'" Here, maintaining the preliminary injunction exacerbates the harm to Defendant with no counterbalancing benefit to the Plaintiff. Through counsel, Winlyn has explained these facts and asked that Plaintiff agree to modify the injunction to lift the asset freeze against Winlyn. Plaintiff has not responded.

*Second*, the public interest is also served by dissolving the preliminary injunction against Winlyn because, stated bluntly, Plaintiff seeks to use its "Emoji" trademark to either profit from or stamp out even purely descriptive uses of the generic word "emoji" in commerce. To the extent Plaintiff succeeds, it reduces consumer choice and restricts consumers' right to search for, discuss and describe emoji designs in the marketplace. Such restraints are not in the public interest, because consumers should have the ability to choose among competing products. *See Vienna Beef Ltd. v. Red Hot Chicago, Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011) (finding that temporary restraining order would not be in public interest where it would curtail

16

competition and the movant had not carried its burden on other factors).

Plaintiff seems to believe that its mere words can recast other companies selling and describing their emoji products as counterfeiters and trademark infringers, but they cannot. *See, e.g., Alzheimer's Disease & Related Disorders Ass'n, Inc., v. Alzheimer's Foundation of Am., Inc.,* 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018) ("The *sine qua non* of trademark infringement is consumer confusion . . . behavior meant to harm a competitor does not necessarily entail infringement if a consumer is unlikely to be confused.") (emphasis added). But the public is harmed when a trademark holder uses weak or meritless intellectual property claims to extract rents from descriptive uses of generic words, or to try to force other companies out of a market. *See generally Kellytoy Worldwide, Inc. v. Ty, Inc.*, 2020 WL 5026255, at *11 (N.D. Ill. 2020). Ultimately, merchants must be allowed to describe their goods and competition should be encouraged—not stamped out through the improper use of intellectual property law. *See, e.g., Mega Mfg., Inc. v. Haco Atlantic, Inc*., 2000 WL 705989, at *9 (N.D. Ill. 2000).

## IV.    CONCLUSION

Plaintiff has failed to make the showing required to justify the extraordinary relief of a preliminary injunction against Winlyn. For all of the reasons set forth above and for good cause shown, Defendant respectfully requests this Court dissolve the preliminary injunction against Winlyn, lift the freeze on Winlyn's Amazon operating account, and grant such other relief as the Court may find appropriate.

Date:  June 13, 2022

Respectfully submitted,


_Peter J. Curtin_
Peter J. Curtin (6332596)
Yichen Cao, Ph.D.
**ARCH & LAKE LLP**
203 North LaSalle Street, Suite 2100
Chicago, IL 60601
Telephone: (312) 558-1369
Facsimile: (312) 614-1873
Email: pete_curtin@archlakelaw.com
        yichencao@archlakelaw.com

Haoyi Chen, Ph.D.
ARCH & LAKE LLP
2500 Wilcrest, Suite 301
Houston, TX, 77042
Telephone: (346) 335-9890
Facsimile: (312) 614-1873
haoyichen@archlakelaw.com

*Counsel for Defendant*
*Shantou City Zhuoxiang Trading Co., Ltd.*

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on June 13, 2022, the foregoing Memorandum in Support of Defendant Winlyn's Motion to Dissolve the Preliminary Injunction And/Or Lift the Asset Freeze, as well as its related Motion, Declarations and Exhibits, were served upon all counsel of record in this litigation by electronic filing through the district's ECF system.

*Peter J. Curtin*

Peter J. Curtin